FILED

02/21/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 15, 2018

## STATE OF TENNESSEE v. TAVARES DEWAYNE BUCHANAN, AKA TAVAREA DEWAYNE BUCHANAN

**Appeal from the Criminal Court for Davidson County**
**No. 2016-A-196      Mark J. Fishburn, Judge**

_____

### No. M2017-02268-CCA-R3-CD

_____

The Defendant, Tavares Dewayne Buchanan, aka Tavarea Dewayne Buchanan, was convicted by a Davidson County Criminal Court jury of aggravated kidnapping, a Class B felony; two counts of rape, Class B felonies; aggravated assault, a Class C felony; felon in possession of a firearm, a Class D felony; and unlawful photography, a Class A misdemeanor, and he was sentenced to an effective term of ten years in incarceration followed by ten years on probation. On appeal, he argues that: (1) the trial court erred in allowing the State to introduce evidence of his prior felony convictions in its case-in-chief; (2) the trial court erred in overruling his objection to the State's vouching for the reliability of the victim in its closing argument; and (3) the evidence is insufficient to sustain his convictions. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., joined. NORMA MCGEE OGLE, J., concurring in results only.

David M. Hopkins, Murfreesboro, Tennessee, (on appeal), and Justin Johnson, Nashville, Tennessee, (at trial), for the appellant, Tavares Dewayne Buchanan.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Danielle Nellis, Lody Limbird, and Jeff George, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In a nine-count indictment, the Defendant was charged with especially aggravated kidnapping, two counts of aggravated rape, aggravated assault, felon in possession of a firearm, unlawful photography, and three counts of child neglect. The State nolle prosequied the three counts of child neglect before jury selection on the day of trial, and trial commenced on the remaining counts.

**State's Proof**

At trial, the victim testified that she and the Defendant previously dated, and they had three children together. During the time period at issue, the Defendant had just "got his own place" and did not stay with her often. On December 25, 2015, she attended a Christmas celebration at the Defendant's aunt's house. Everyone at the party was "having fun" and, at one point, all of the women, including her, were dancing. The majority of the time, the Defendant was in another room with his male relatives. After the party, the victim went to her stepmother's house, where she stayed for a couple of hours, before returning to her home around 10:00 p.m. While she was at her stepmother's house, the victim exchanged text messages with the Defendant, and he indicated that he was going to his cousin's house.

When the victim got home, she saw the Defendant's car in the parking lot but did not think anything of it because the Defendant had told her that he was going to his cousin's. Her children were asleep when she got home, so she removed each child from the car one-by-one and took them to their upstairs bedroom. She made a final trip to her car to retrieve the children's presents and, when she re-entered the house, saw the Defendant standing in her unlit living room. The victim said that she laughed when she saw the Defendant because they had been getting along well, and he had given no indication that he was upset.

The victim recalled that the Defendant confronted her about her continued use of Facebook. When she asked him what he was talking about, he said, "'Don't play me stupid,' . . . 'You already disrespected me at my family's house.'" The victim, again, asked the Defendant what he was talking about, and the Defendant told her to "'[g]ive me your face.'" She began crying because she knew the Defendant was going to hit her. The victim asked the Defendant what she had done, and the Defendant said, "You was shaking yo a\*\* in front of my cousins and everybody like a little ho." The Defendant hit the victim in the stomach, causing her to fall to the ground, and threw her son's motorized car onto her back. The Defendant continued to hit, kick, and stomp on the victim, then dragged her upstairs by her hair and shirt.

The victim testified that, in her upstairs bedroom, the Defendant smacked and hit her, knocking her to the ground. The Defendant cut off pieces of her hair. The Defendant made the victim undress and poured hand sanitizer all over her body. He threw DVDs at her "like a Frisbee," cutting her face and lip. He also cut up photographs

2

of the victim's oldest daughter. While they were in the bedroom, the Defendant pulled out an unloaded gun and put a bullet in the chamber. The Defendant spun the cylinder, pointed the gun at the victim, and pulled the trigger. After pulling the trigger, the Defendant said, "'woo hoo, b****, you lucky[.]'" At some point, the Defendant gave the victim the gun and told her to put it in her mouth and kill herself. She put the gun in her mouth but began crying, saying she could not do it. The victim said that she did not feel free to leave or able to escape during the entire encounter with the Defendant.

The victim testified that the Defendant asked her if she wanted to take a shower and, while she was doing so, he pulled the shower curtain back with the gun and said, "POW, POW, POW[,]" which terrified her and caused her to jump, flinch, and fall. The Defendant also poured cold water on her repeatedly with a cup as he accused her of disrespecting him in front of his family. The victim began to feel like she would pass out and did not believe she would survive. Asked whether she felt free to leave the bathroom while this was happening, the victim responded that she "didn't think about leaving" and did not believe now that she could have left. She said that she "just wanted to do whatever he wanted me to do." The Defendant told her to get out of the shower and then beat her in the hallway with a belt until the belt broke. She was afraid that her children would find her dead and "just knew it was over[.]"

The victim recalled that during the encounter, the Defendant took videos of her on his cellphone while she was naked and to which she did not consent. He called her demeaning names as he filmed her. The Defendant drew on the victim's face and wrote the word "F***" on her forehead, saying he would post the recording to a prostitution website the next time she thought she was better than everyone or wanted to "show out." Some of the recordings made by the Defendant were of the victim when she was in the shower.

The victim testified that the Defendant dragged her downstairs and told her to dance like she had at the party. The Defendant hit her with the belt while she was dancing and then stood behind her and penetrated her vagina with his penis. The victim said that she did not consent to the penetration and believed the Defendant still had the belt available to him while he did so. The Defendant eventually stopped and then ordered the victim to perform oral sex on him. The victim did not know the location of the belt or gun at that time but felt that she had no choice other than to comply. As she performed oral sex, the Defendant accused her of being promiscuous and smacked her, which caused her to accidentally bite his penis. The Defendant responded by hitting and kicking her.

The victim testified that the Defendant let her sleep at some point. He told her to lay down with him but to use the bathroom first if she needed to "because you not gonna move[.]" He warned her, "'you better not move[,]' . . . 'You better not flinch'" and said something like he would hit her if she did. She did not feel free to leave or escape the

3

bed, much less the bedroom. She woke up to the Defendant smacking her and saying, "'Get up, we fixin' to start all over.' . . . 'I woke up still feeling like beating yo a**.'"

The victim testified that she had no sense of time until December 26 around 4:00 p.m. The victim stated that she did not feel free to leave her home between 10:00 p.m. on December 25 until 4:00 pm. on December 26. She did not believe the Defendant would let her leave or that she could reach out for help. The victim said that the first time she felt free to leave was at 4:00 p.m. on December 26 when the Defendant returned her cellphone and left her house.

The victim testified that when the Defendant left, she got dressed and went to check on her young children, whom she had not been able to attend to since the night before. Not knowing how long the Defendant would be gone, she hurriedly prepared the children and put clothes in a trash bag; however, the Defendant returned with a friend before she could leave. When the Defendant saw the trash bag of her belongings, he pulled the victim by her hair and shirt and started hitting and kicking her again. The Defendant told the victim to leave with him, walking her to his car while holding her arm and stating, "'If you try anything stupid, I'm gonna beat yo a** in front of everybody out here.'" The victim said that she did not feel free to leave or able to escape. The Defendant's friend stayed at her home with the children.

The victim testified that the Defendant drove the two of them to a friend's house. As they were driving, the Defendant told her that he would push her out of the car if he learned that the police were at her house. When they arrived, the Defendant left the victim in the car and went inside. The victim said that she contemplated running, but she did not know how long the Defendant would be gone or where she would go with there being several dogs in the neighborhood and the possibility of the Defendant catching her. She also explained that she did not know if the Defendant was watching her from inside or whether he had a weapon. The victim used her phone to call the Defendant's mother, and she acknowledged that she probably could have called somebody else but explained that she "was scared to get other people involved because [the Defendant] was not in his normal state of mind." She said that she did not call the police because the Defendant had "made [her] pay for it" when she called the police on him on a previous occasion. The Defendant checked her phone to see if she had called the police when he returned to the car. The Defendant then drove to a house in an unfamiliar neighborhood. The victim again contemplated leaving or escaping but "just didn't know."

The victim testified that the Defendant then drove back to her house, and his friend left. By this point, the Defendant was "being really apologetic and being nice and just saying how sorry he was and he hate[d] that I made him do that to . . . me." That night, the Defendant allowed her to leave alone to get food for the family, but she did not try to escape because she was trying to regain his trust so she could move into a shelter the following Thursday as she had already planned.

4

The victim testified that the next day, December 27, she told the Defendant that the children needed to go to daycare so the workers would not get suspicious that something was amiss and that she also needed to go to a babysitting job. She texted with the Defendant the entire time she was away, as well as spent time with him over the ensuing days, in a continued effort to regain his trust, which was important for her escape. She admitted that she did not call the police or seek medical treatment during the time she was away from the Defendant.

On December 29, the victim took her children to daycare and called the police. The victim explained that she did not feel safe enough to call the police until that time. The victim called the Drug Task Force because she wanted the Defendant to be arrested for drugs and not domestic violence, as he would know that an arrest for domestic violence was due to her and she "needed him arrested just long enough for [her] to get [her] and [her] kids' stuff out [of] the house and just leave."

The victim met with the officers in the Department of Human Services' parking lot for a short amount of time before she had to leave to pick up her children from daycare. She did not have time that day to give a complete account of what had taken place with the Defendant, and she did not want the Defendant to know that she provided the information leading to his arrest. She provided a brief description of what happened but did not mention the videos or sexual abuse. She met with officers a second time about a week later, and she did not recall providing any more details than she had during her first discussion with them. The victim said that she met with an assistant district attorney several weeks later and gave another statement about the incident, in which she provided details that she had not given during her previous interviews.

Detective Jason Door with the Metro Nashville Police Department's Domestic Violence Division testified that he was contacted by officers in the Special Investigations Division when domestic violence allegations arose during their interview with the victim on December 29. He interviewed the victim for approximately twenty minutes and, as a result of the interview, pursued warrants against the Defendant. Detective Door took photographs of the victim's injuries, but he explained that he was a new detective at that time, and the quality of the photographs was poor. He observed and attempted to photograph multiple bruises, scratches, and a cut to the victim's lip. The victim told him that she was in pain. Detective Door said that he originally did not charge the Defendant with rape, as the victim did not report being forced to have vaginal intercourse or perform fellatio. Detective Door followed up with the victim on a later date, and he did not recall any changes in her story from what she originally told him.

Sergeant Chad Young with the Metro Nashville Police Department testified that he was part of the Major Case Task Force in December 2015 and in such capacity met with the victim on December 29 "to discuss some possible information regarding investigations." He learned that the Defendant might have recordings concerning a

"domestic situation" on his cellphone. Sergeant Young arrested the Defendant the following day on domestic violence warrants. He confiscated a cell phone from the Defendant during the course of the arrest. Sergeant Young recalled that the Defendant "grew concerned" when told that his phone was being confiscated and repeatedly asked why the police were taking it and how he could get it back. Sergeant Young obtained a search warrant for the phone and submitted it for analysis.

Detective Chad Gish with the Metro Nashville Police Department's Digital Forensics Unit testified that he recovered four videos from the Defendant's cellphone that depicted a nude African-American woman with a "busted lip" and the word "F***" written on her forehead. The videos showed "an adult male" having "a belittling conversation" with the nude woman. The woman was crying in the videos, and she was "standing up naked in a shower" in two of the videos. Detective Gish extracted images from the videos, including an image of the Defendant's reflection in the bathroom mirror. Detective Gish stated that the data from the videos indicated that they were taken the morning of December 26, 2015.

**Defendant's Proof**

Detective Caleb Rogan with Metro Nashville Police Department testified that he assisted in taking the report from the victim on December 29, 2015. Detective Rogan admitted that the diagram in his report only noted a cut to the victim's lip and minor scratches on her back. However, he noted that he only saw the front of the victim's face while she sat in a dark car and that he did not actually inspect the victim himself.

Following the conclusion of the proof, the jury convicted the Defendant of the lesser-included offenses of aggravated kidnapping and two counts of rape, and as charged of aggravated assault, felon in possession of a weapon, and unlawful photography. The Defendant appealed.

**ANALYSIS**

**I. Prior Conviction**

The Defendant argues that the trial court erred in allowing the State to introduce evidence of his prior felony conviction in its case-in-chief, relevant to the charge of felon in possession of a firearm. He asserts that the trial court should have asked that he stipulate to the prior conviction or have a bifurcated trial on the charge.

Prior to trial, the Defendant filed a motion in limine asking that the trial court hold a jury-out hearing regarding the admissibility of other crimes evidence before the admission of any such evidence. The court granted the motion and conducted a hearing in which it addressed the State's intention to introduce a certified copy of the Defendant's

prior conviction for sale of a controlled substance to support the charge of unlawful possession of a firearm by a convicted felon. The trial court stated, "[Y]ou'll be doing that in a bifurcated -- the only thing that's going to the jury during the first phase . . . is unlawful possession of a weapon. If they convict him of that, I don't know if he is going to contest that he's a convicted felon or not." The State responded that it was concerned about a bifurcated proceeding because it "is not unlawful to possess a weapon in your home. The unlawfulness is that he was, indeed, a felon and possessed it."

The Defendant argued that he would be prejudiced by admitting to the prior felony and objected to "agreeing to incriminate himself through the introduction of that conviction." The State responded that it had to prove that the Defendant was a felon, "no matter how prejudicial [defense counsel] might argue that that is." The State noted that the jury instruction directed the jury not to consider the Defendant's prior record in deciding the outcome of the present charges and that "[t]hey can only use it to note that it meets that element of the crime." The State suggested that the Defendant waive his right to a jury trial on the felon in possession of a weapon charge and let the trial court conduct a bench trial on that count. Defense counsel responded, "[T]his is the reason for bifurcation of an issue. Once again, I would object to anything that would make him appear to be guilty of something that is not before the jury such as his prior felony." The trial court announced that it would inform the parties of its decision before jury selection, but the ruling does not appear to be included in the record.

After the reading of the indictment, the trial court informed the jury that "the indictment is simply the formal written instrument that brings [the Defendant] into this courtroom, it is not evidence against him and cannot be considered or used against him in any manner whatsoever." The court continued: "You also heard during the reading of the indictment that [the Defendant] has been previously convicted of a felony drug offense, you are not to consider that felony conviction for any reason whatsoever during the course of the trial other than as an element of that particular offense[.]" The court elaborated that "the fact that he had been previously convicted of a crime is no indication that he has any propensity whatsoever to commit the crime for which he is now on trial and you cannot consider that prior conviction in that context whatsoever." After the opening statements, the State introduced a certified judgment of the Defendant's prior felony drug conviction.

The admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion. State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004). See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court's exercise of discretion will only be reversed on appeal if the court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Robinson, 146 S.W.3d at 490 (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

7

When determining admissibility, a trial court must first decide if the evidence is relevant. Tenn. R. Evid. 402 ("All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible."); Robinson, 146 S.W.3d at 490. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice[.]" Tenn. R. Evid. 403.

Evidence of a defendant's prior crimes is not admissible to show that the defendant acted in conformity with the prior bad acts. Tenn. R. Evid. 404(b). However, evidence of a defendant's prior conduct is admissible if a material issue exists other than conduct conforming to a character trait, and the probative value outweighs the danger of unfair prejudice. Id.

Tennessee courts have "long held that the name or nature of crimes other than that for which the defendant is on trial is relevant to establish an essential element of the crime for which the defendant is being tried." State v. James, 81 S.W.3d 751, 760 (Tenn. 2002) (citing State v. Wingard, 891 S.W.2d 628, 633-34 (Tenn. Crim. App. 1994); State v. Blackmon, 701 S.W.2d 228, 232 (Tenn. Crim. App. 1985); Lacey v. State, 506 S.W.2d 809, 811 (Tenn. Crim. App. 1974)). However, when evidence of a defendant's prior conviction is necessary to prove the status element of an offense, the defendant may offer to stipulate his status as a felon. See James, 81 S.W.3d at 762. In the limited circumstance when the sole purpose of introducing evidence of a defendant's prior convictions is to prove the status element of an offense and the defendant offers to stipulate his status as a felon, the probative value of the evidence is, as a matter of law, outweighed by the risk of unfair prejudice. Id. When there is no stipulation, however, the "probative value of an essential element of the offense would almost always outweigh any potential prejudice under Rule 404(b) [of the Tennessee Rules of Evidence], [and therefore the] specific nature of the offense [would be] admissible." Wingard, 891 S.W.2d at 634, overruled on other grounds by James, 81 S.W.3d at 763 n.7.

The record supports the trial court's decision to allow the State to introduce evidence of the Defendant's prior conviction to prove an essential element of the unlawful possession of a firearm charge, as the State had to prove that the Defendant possessed a firearm and had a previous conviction for a felony drug offense. At the hearing on the Defendant's Rule 404(b) motion, the Defendant refused to stipulate to his status as a felon convicted of a felony drug offense. Absent a stipulation, the probative value of the Defendant's prior conviction outweighed the prejudicial effect. The court was not required to pressure the Defendant into stipulating to his prior conviction. See State v. Ford, 725 S.W.2d 689, 691 (Tenn. Crim. App. 1986) (stating that "[s]tipulations

8

are favored and should be encouraged and enforced by the courts, . . . [but] it is not the duty or function of a trial court to require one of the parties to the litigation to stipulate with his adversary."). Moreover, the court was not required to hold bifurcated proceedings on the felon in possession of a firearm charge. See State v. Stephan Richardson, No. W2016-02227-CCA-R3-CD, 2018 WL 821775, at *16 (Tenn. Crim. App. Feb. 9, 2019) (stating that "[w]hile [State v.] Foust[, 482 S.W.3d 20, 46-47 (Tenn. Crim. App. 2015)] recommended bifurcation, none of the opinions of this court have required bifurcation."); State v. Timothy Damon Carter, No. M2014-01532-CCA-R3-CD, 2016 WL 7799281, at *27 (Tenn. Crim. App. Mar. 8, 2016) (stating that "[w]e know of no authority, and the Defendant points us to none, that requires the jury to first hear proof of one element of this charge, that the Defendant possessed a weapon, before hearing proof that he was a prior convicted felon."). We additionally note that the Defendant's prior conviction was for an offense very dissimilar to those for which he was on trial, thus minimizing the risk of prejudice. Furthermore, the trial court avoided any potential prejudice by issuing limiting jury instructions regarding any such proof, and the jury is presumed to follow the instructions of the court. See State v. Johnson, 401 S.W.3d 1, 22 (Tenn. 2013). The Defendant is not entitled to relief on this issue.

## II. Closing Argument

The Defendant argues that the trial court erred in overruling his objection to the State's vouching for the reliability of the victim in its closing argument.

During its closing argument, the State made the following statement, to which the Defendant objected:

> [T]he most important part of this case, other than the elements, . . . is whether or not you believe [the victim], because if you believe [the victim], you must return verdicts of guilty because everything she testified to satisfies the elements of this crime. At the end of the day this all comes down to whether or not you believe [the victim], and she gave you no reason not to believe her. She's assumed to be telling the truth. She has no reason to lie. There's no motive here for her to come in here after this long process and lie. This is not a fun experience to sit there with face buried in hands while fourteen strangers watch videos of you naked and crying and humiliated, that's not fun. She has no reason to put herself through this.

The five generally recognized areas of prosecutorial misconduct occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making

9

predictions on the consequences of the jury's verdict; or intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). It is well established that it is improper for a prosecutor to personally vouch for the credibility of any witness. See, e.g., Goltz, 111 S.W.3d at 6 ("It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.").

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, the comments must be shown to have prejudiced the case by affecting the jury's verdict. Middlebrooks, 995 S.W.2d at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Id. at 560.

Upon review, we cannot conclude that the prosecutor's comments constituted vouching. The prosecutor did not express a personal belief or opinion as to the truth of the victim's statements or her credibility. Viewed in context of the surrounding argument, it is clear that the prosecutor was explaining why the jury should accredit the victim's testimony, not "vouching" for the victim based on personal belief in her testimony. Even if the prosecutor's comments did amount to prosecutorial misconduct, the Defendant has failed to prove that they were so improper that they affected the jury verdict to his detriment. The complained of statements were isolated and appear to have been made unintentionally. The jury's acquitting the Defendant on the most serious charges, especially aggravated kidnapping and two counts of aggravated rape, and instead finding him guilty of the lesser-included offenses of aggravated kidnapping and rape, indicates that the jury carefully considered the evidence and based its decision on the evidence, not the prosecutor's statements during closing argument. The Defendant is not entitled to relief on this issue.

### III. Sufficiency

The Defendant argues that the evidence is insufficient to sustain his convictions, asserting that the victim's testimony was not credible and that the State failed to prove the essential elements of each offense.

10

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To sustain the conviction for aggravated kidnapping, the State had to prove that the Defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with her liberty and that he did so while in possession of or threatening the use of a deadly weapon. Tenn. Code Ann. §§ 39-13-302(a); -304(a)(5). A removal or confinement is unlawful if it is "accomplished by force, threat or fraud[.]" Id. § 39-13-301(15). Whether the removal or confinement constituted substantial interference with the victim's liberty is a question of fact for the jury to resolve. State v. White, 362 S.W.3d 559, 579 (Tenn. 2012).

The Defendant argues that the State failed to establish that the victim was confined or that he substantially interfered with her liberty. Specifically, the Defendant asserts that at one point the victim testified that "she did not even think about leaving," the victim left the house by herself on several occasions during three days, and the victim's plan to return to gain the Defendant's trust did not constitute confinement.

11

Viewed in the light most favorable to the State, the evidence is sufficient to sustain the Defendant's conviction for aggravated kidnapping. The Defendant confronted the victim in her living room around 10:00 p.m. on December 25, and he took away her phone and did not return it until 4:00 p.m. the following day. The Defendant beat the victim in the living room and then dragged her upstairs by her hair and shirt. He told the victim to undress and then threw DVDs at her, drew on her face, cut her hair, and continued to hit and kick her. The victim recalled that the Defendant had a loaded gun that he used to play a one-sided game of Russian roulette. When the Defendant told the victim to get in the bed, he threatened to beat her if she moved, even to go to the bathroom. The victim told the jury that she did not think she would survive and did not feel free to leave or escape while in the living room, her bedroom, or her bed. The first time she felt that she could leave was around 4:00 p.m. on December 26, when the Defendant returned her phone and left the house. She got dressed, went to check on her small children for the first time in eighteen hours, and attempted to flee but was stopped by the Defendant's return. Although the victim stated, as pointed out by the Defendant, that she did not think about leaving while in the bathroom, the jury could rationally infer that the victim thought escape was impossible. The victim's testimony, accredited by the jury, sufficiently establishes that the Defendant, while in possession of a deadly weapon, unlawfully confined the victim to her home, substantially interfering with her liberty.

Rape is "unlawful sexual penetration of a victim by the defendant or the defendant by a victim" when "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent[.]" Tenn. Code Ann. § 39-13-503(a)(2). "Sexual penetration" includes sexual intercourse and fellatio. Id. § 39-13-501(7). The State had to prove sexual intercourse to sustain the conviction in Count 2 and fellatio to sustain the conviction in Count 3. This court has held that "a showing of lack of consent by the victim is sufficient to sustain a rape conviction," and that "[n]on-resistance is not consent." See, e.g., State v. Josh Andrew Danoff, No. M2017-00506-CCA-R3-CD, 2018 WL 3323756, at *3 (Tenn. Crim. App. July 6, 2018); State v. Petr Pompa, No. M2016-00193-CCA-R3-CD, 2017 WL 1014529, at *4 (Tenn. Crim. App. Mar. 15, 2017), perm. app. denied (Tenn. July 28, 2017). The issue of consent is a question for the jury. Haynes v. State, 540 S.W.2d 277, 278 (Tenn. Crim. App. 1976).

The Defendant argues that the State did not prove that he sexually penetrated the victim without her consent. He specifically asserts that he was not armed and did not threaten the victim, that the victim was not in fear of assault when he penetrated her, the victim did not ask him to stop or attempt not to engage in intercourse with him, and the victim did not refuse his request for oral sex or otherwise indicate that she did not consent to oral sex.

Viewed in the light most favorable to the State, the evidence shows that after hitting and kicking the victim, stomping on her head, pointing a loaded gun at her and

12

pulling the trigger, beating her with a belt, and making her dance while beating her with a belt, the Defendant came up behind the victim and penetrated her vagina with his penis. The victim testified that she did not consent to this penetration, did not know the location of the gun, and believed the Defendant still had access to the belt while penetrating her. The victim said that when the Defendant told her to perform oral sex on him, she felt like she did not have a choice. As the victim performed oral sex on the Defendant, he smacked her and proceeded to hit and kick her. From this evidence, the jury could infer that the victim did not consent to the Defendant's penetrating her or to performing fellatio on him, sufficient to sustain his two convictions for rape.

In order to convict the defendant of aggravated assault, the jury had to find that the defendant intentionally or knowingly, by using or displaying a deadly weapon, caused the victim to reasonably fear imminent bodily injury. Tenn. Code Ann. §§ 39-13-101(a)(2); 39-13-102(a)(1)(A)(I). To sustain the Defendant's conviction for felon in possession of a firearm, the jury had to find that the Defendant "possesse[d] a firearm, as defined in § 39-11-106, and . . . [h]a[d] been convicted of a felony drug offense." Id. § 39-17-1307(b)(1)(B).

As to these two convictions, the Defendant argues that the State failed to prove that he used or displayed a weapon or that he possessed a firearm. He asserts that that the only evidence that he possessed a firearm was from the testimony of the victim, whose credibility he questions, and who could only give a brief description of the firearm and did not testify about her basis of knowledge of firearms or that the object she saw was an actual firearm. He additionally asserts that there was no evidence that he was found in possession of a firearm and that no firearm was recovered from the victim's apartment or admitted into evidence at trial.

Viewed in the light most favorable to the State, the victim testified that the weapon used by the Defendant that night was a chrome revolver with a brown handle that he kept at her house. The victim said that the Defendant loaded a bullet into the chamber of the gun, pointed it at her and pulled the trigger, stating "woo hoo, b****, you lucky" when it did not expel the bullet. The State introduced a certified copy of the Defendant's prior felony drug conviction into evidence. The jury could find from the victim's testimony that the Defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury by the use or display of a deadly weapon, and that the Defendant possessed a firearm after previously being convicted of a felony drug offense. To the extent the Defendant calls the victim's credibility into question, we reiterate that all questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the jury. See Pappas, 754 S.W.2d at 623.

The unlawful photographing statute codified in Tennessee Code Annotated section 39-13-605 provides as follows:

13

(a) It is an offense for a person to knowingly photograph, or cause to be photographed an individual, when the individual is in a place where there is a reasonable expectation of privacy, without the prior effective consent of the individual, . . . if the photograph:

> (1) Would offend or embarrass an ordinary person if such person appeared in the photograph; and

> (2) Was taken for the purpose of sexual arousal or gratification of the defendant.

The Defendant argues that the State failed to prove that he photographed the victim for his own sexual arousal or gratification because "there are many motives for such actions." (Def. brief pg. 19) The Defendant took four videos of the victim on his cellphone while she was completely naked. In the first video, the Defendant filmed the nude victim as she sat on the bed with her legs spread, and he panned his phone between the victim's breasts and genitals and ended with a close-up shot of her vagina. In the second video, the Defendant filmed the nude victim kneeling on the floor, while he scanned the camera up and down her torso and captured a close-up shot of her exposed buttocks. In the third video, the Defendant filmed the nude victim in the shower, with the majority of the video taken in such a way that the focus was almost entirely on her breasts and genitals. In the fourth video, the Defendant again filmed the nude victim in the shower, focusing on her entire body. In the light most favorable to the State, from the nature of this evidence and manner in which it was filmed, the jury could use common sense and infer that the Defendant photographed the victim for his own sexual arousal or gratification. See State v. Jeffrey R. Dickens, No. M2003-00783-CCA-R3-CD, 2004 WL 735025, at *4 (Tenn. Crim. App. Apr. 6, 2004).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

14